IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| State of Arizona,<br><br>Plaintiff,<br><br>-vs-<br><br>Russell Files,<br><br>Defendant. | Case No. 2:13 CR 436 - DGC<br><br>MEMORANDUM OPINION AND ORDER RE: FEDERAL IMMUNITY DEFENSE<br><br>JUDGE JACK ZOUHARY |

## INTRODUCTION

Defendant Russell Files ("Files"), a former federal Wildlife Services ("WS") employee, urges this Court to apply a seldom-litigated principle of federal constitutional law -- federal Supremacy Clause immunity -- to bar the State of Arizona from prosecuting him for animal cruelty (Docs. 48 & 50). This Court held a two-day evidentiary hearing in March 2014, and heard oral argument on the issue in April 2014. At this Court's invitation in May 2014 (Doc. 80), the parties executed jury-trial waivers in June and July, respectively, limited to factual issues material to resolving Defendant's Motion to Dismiss (Docs. 82–83). This Court now approves those jury-trial waivers. *See* Federal Criminal Rule 23(c).

This case is about a man and a dog named Zoey -- not his dog, but his neighbor's -- a neighborhood dispute that has, literally, become a federal case. Robert Frost in his poem *Mending Wall* recounted that not always do "good fences make good neighbors" -- as in this case. The story of this case takes place in November–December 2012 and ends with Zoey severely injured after being caught in a trap set by Files in his front yard. But before the underlying facts are shared, the legal niceties are addressed.

## DISCUSSION

**Procedural Background**

Files is a criminal defendant in a prosecution initiated by the State of Arizona and appears before this Court thanks to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). In March 2013, Files filed a notice of removal to this Court from the Superior Court of Arizona, Maricopa County (Doc. 1). The State of Arizona moved to remand the case to state court (Doc. 2). Following a September 2013 evidentiary hearing, Judge David Campbell denied the State's motion, finding Files had established (1) a nexus between his duties as a federal officer and the criminal charges at issue in this case and (2) colorable federal defenses (Doc. 17 at 2–4). Files' asserted federal defenses -- Supremacy Clause immunity and a public authority defense -- provide the basis for this Court's subject matter jurisdiction. *See Mesa v. California*, 489 U.S. 121, 136 (1989) ("Section 1442(a) . . . is a pure jurisdictional statute . . . . [I]t is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes. The removal statute itself merely serves to overcome the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged.").

In February 2014, Files moved to dismiss the Indictment on the basis of Supremacy Clause immunity (Doc. 48). In their briefs, the parties discussed the application of the immunity defense to this case (*see* Docs. 48 & 50), but neither party broached an equally important question: who decides whether the defense applies -- judge or jury?

This Court discussed that question with the parties and all agreed this Court should follow the procedural framework endorsed by the plurality opinion in *Idaho v. Horiuchi*, 253 F.3d 359, 374–76

*vacated as moot*, 266 F.3d 979 (9th Cir. 2001).[1] *See* Doc. 52; Docs. 72–73, TR 10; Doc. 81 at 4, 6. ("TR" refers to the March 2014 evidentiary hearing transcript at Docs. 72–73.)

This agreed-upon approach to disposing of this Motion raises another procedural question. There are strong indications that the Sixth Amendment's jury-trial guarantee does not extend to factual disputes material to a Supremacy Clause immunity defense. *See, e.g.*, *In re Neagle*, 135 U.S. 1, 75 (1890) ("The circuit court of the United States was as competent to ascertain these facts [material to the immunity defense] as any other tribunal, and it was not at all necessary that a jury should be impaneled to render a verdict on them. It is the exercise of a power common under all systems of criminal jurisprudence. There must always be a preliminary examination by a committing magistrate, or some similar authority, as to whether there is an offense to be submitted to a jury."). Supremacy Clause immunity does not simply provide, as in the case of a defense of justification or excuse, "a mere shield against liability" but rather "immunity from suit." *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004). *See also Clifton v. Cox*, 549 F.2d 722, 730 (9th Cir. 1977) (observing that when the defense applies "the prosecution has no factual basis upon which to prosecute [the defendant] and the entire proceeding is a nullity"). Once a Supremacy Clause immunity defense is established, it is not left to a federal or state jury to acquit the defendant of state-law criminal charges, or to a federal or state judge to direct a verdict in the defendant's favor; the federal or state court is

---

[1] Only four of the eleven members of the *Horiuchi* en banc court joined in Section IV of then-Judge Kozinski's opinion. Two other judges dissented from Section IV's treatment of the "who decides" question, but otherwise joined in Judge Kozinski's opinion. *Horiuchi*, 253 F.3d at 378–80 (W. Fletcher, J., concurring in part and dissenting in part). The remaining five dissenting members did "not reach the issue of who resolves" material factual disputes, because these five judges found no such factual disputes at play in *Horiuchi*. *See Horiuchi*, 253 F.3d at 390 (Hawkins, J., dissenting). But if "[f]orced to confront the issue squarely," four of the five dissenting judges observed, in *dictum*, "resolution of the factual issues pertaining to immunity by the judge [rather than a jury] seems more consistent with the protective purposes of Supremacy Clause immunity." *Id*. at 380 n.* & 390 n.12.

instead stripped of any jurisdiction over the defendant. *Ohio v. Thomas*, 173 U.S. 276, 283, 19 S. Ct. 453, 455 (1899).

Finally, one further point of explanation by way of procedural background, not of this case but of the broader controversy that gave rise to this case. The U.S. Department of Agriculture ("USDA") -- the cabinet-level agency in which WS is housed -- conducted a personnel misconduct investigation, assessing the actions of WS employees involved in the December 2012 trapping of Zoey. That investigation, probing a broader range of issues than are implicated by the present Motion, produced the sworn statements of Files' two supervisors, both dated March 2013 (Exs. 113–14). Except for those two statements, this Court does not consider any aspect of the USDA investigation.

**Federal Supremacy Clause Immunity**

Supremacy Clause immunity is an outgrowth of the Supremacy Clause's hierarchical principle. This defense applies where a federal officer is held "to answer for an act which he was authorized to do by the law of the United States, which it was his duty to [do as a federal officer], and if in doing that act he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under the law of" any state. *In re Neagle*, 135 U.S. at 75. The defense provides a mechanism for carrying into execution a relatively straightforward principle that exists in our federal system of government where the central government is deemed supreme within its legislative jurisdiction: "An act cannot simultaneously be necessary to the execution of a duty under the laws of the United States and a [criminal] offense to the laws of a state." *Denson v. United States*, 574 F.3d 1318, 1347 (11th Cir. 2009).

In the roughly 125 years since the defense's foundation, case law identifies two components necessary for the defense to apply. First, the action which forms the basis of the state prosecution must have been within the scope of the federal officer's authority. In this Circuit, "[w]hat is meant

by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if [the officer] had been using his power for any of the purposes on whose account it was vested in him." *Clifton*, 549 F.2d at 726 (quoting *Barr v. Mateo*, 360 U.S. 564, 572 (1959)). Conduct may be within the scope of a federal officer's authority even if of "questionable legality" or taken without specific direction of a superior. *Id*. at 727 & 728 n.12. *See also Wyoming v. Livingston*, 443 F.3d 1211, 1219 (10th Cir. 2006) (noting that relevant Supreme Court authority gives "grants of federal authority a generous sway"); *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982) ("[T]he necessary authority [to support invocation of the defense] could be derived from the general scope of the officer's duties."); *Connecticut v. Marra*, 528 F. Supp. 381, 385–86 (D. Conn. 1981) (collecting cases finding sufficient authorization for an action in "general statutes authorizing an agency to function," in agency regulations, and in congressional appropriations).

While the case law does not endorse an "anything goes" approach to fixing the authority of federal officers, *see Colorado v. Symes*, 286 U.S. 510, 518 (1932); *In re McShane*, 235 F. Supp. 262, 273 (N. D. Miss. 1964), it does not limit the defense to actions specifically directed by statute or by rule. *See Livingston*, 443 F.3d at 1227–28 (noting, though the relevant regulations did not provide "an explicit grant" for U.S. Fish & Wildlife Service staff to "trespass" on private land in the course of their duties, federal law nonetheless authorized the "capture and collar operation that led to [the officers'] indictments"). Instead, most (if not all) Supremacy Clause immunity defenses have turned on the defense's second element: whether the federal officer's actions, now the basis of a state-court indictment, were "necessary and proper to the execution of his responsibilities." *Morgan v. California*, 743 F.2d 728, 731 (9th Cir. 1984).

Conduct is "necessary and proper" for purposes of the defense if a subjective and an objective component are established: the determination "must rest not only on the subjective belief of the officer" that his or her actions were reasonable, "but also on the objective finding that [the officer's] conduct may be said to be reasonable under the existing circumstances." *Clifton*, 549 F.2d at 728. *See also Livingston*, 443 F.3d at 1229 ("Supremacy Clause immunity cases require courts to evaluate the circumstances as they appear to federal officers at the time of the act in question, rather than the more subtle and detailed facts later presented to a court."). The focus of the necessary and proper inquiry is not whether, in fact, the federal officer's conduct was lawful; this Court must instead determine whether Files "employed means which he could . . . honestly consider reasonable in discharging his duties." *Clifton*, 549 F.2d at 730. While a state opposing a Supremacy Clause immunity defense need not necessarily show the federal officer acted with malice, *see Horiuchi*, 253 F.3d at 366 n.10 (observing conduct could be objectively unreasonable though undertaken with good intent), if the evidence shows a federal officer acted "out of malice or with some criminal intent" the officer's conduct certainly will fall outside the scope of the defense. *Clifton*, 549 F.2d at 728. *Cf. in re Lewis*, 83 F. 159, 160–61 (D. Wash. 1897).

## FACTUAL FINDINGS AND LEGAL ANALYSIS

**Family Feud**

Files resides in a single-family home on a cul de sac in El Mirage, Arizona (Ex. 112 (Google Maps image of the cul de sac)), a suburb of Phoenix (TR 88). His home is one of several dozen in a relatively new subdivision (TR 29; Ex. 111). Files and wife Judi have three children: a son, Drew, and two younger daughters (TR 88–89). In 2012, when the principal events relevant to this prosecution occurred, Drew was approximately 18 years old and his sisters were around 8 and 5 years old. The Files family has two pet dogs.

Files worked as a federal wildlife "urban specialist" since 2006, with duties similar to an animal control officer. A typical day for Files included "shooting pigeons, capturing ducks, trapping coyotes" and similar conduct aimed at preventing "human/animal" conflicts (TR 90).

Britan and Lindsay Hartt, formerly husband and wife, moved into the same cul de sac in 2010 (Ex. 111-M). *See also* Ex. 112 (Google Maps overhead image showing the neighborhood). The Hartt and Files families became friends (TR 164) but, around October 2011, they had a falling out, developed "sour feelings" toward one another (TR 166–67), and stopped being friends (TR at 31). The families generally avoided one another (TR 181, 191). Files' counsel described the neighborhood situation as a "cold war" (Doc. 81 at 33).

Zoey, the dog at the center of this dispute, is a medium-sized Australian cattle dog (TR 162), and was approximately seven years old in 2012 (TR 162–63). Zoey's fur has a distinctive white-and-burnt orange-and-brown coloration. Zoey's entire head is covered in burnt orange fur, as is her mid-back and rump (interspersed by shades of brown); she is otherwise white in color, including on her chest and tail (Ex. 117; Doc. 50-7).

**Good Dog, Bad Dog**

This Court heard Zoey described in diametrically opposed ways. The Hartts described Zoey as docile and well-mannered, with no history of unprovoked aggression toward people or property (TR 163, 166). They claim Zoey behaved "good" around Files, who (when neighborly relations still existed) even used his animal expertise to administer Zoey's immunizations (TR 165). They describe Zoey as an obedient and fun-loving dog (TR 188). Lindsay Hartt's father, Benny Cameron, observed that Zoey would let the Hartt children roughhouse with her (TR 203).

By contrast, Files testified that, on at least three occasions, Zoey acted with "aggression" toward a Files family member. During a pool party at the Hartt home, Files claims Zoey bit him on

the ankle for no apparent reason (TR 97). Lindsay claims Files provoked the incident by grabbing and startling Zoey (TR 190–91). Cameron somewhat confirms Lindsay's story -- that Files startled Zoey upon his arrival at the party (TR 204).

Drew related two similar incidents. In early 2011, while standing in his driveway, Zoey, unprovoked, bit Drew on the calf (TR 24). Later, in November 2012, Drew left home on his skateboard to meet a friend at a nearby gas station. He saw Zoey, unattended, standing in a neighbor's front yard; Zoey then "came out of the yard very, like, half a little bit aggressive," and chased Drew. He dismounted his skateboard to "defend [him]self." Zoey "stopped, within, like, two feet away and growled and showed her teeth and snarled and head-faked" and then ran away, scaling a neighbor's fence to enter a backyard (TR 23). This incident was not reported to the Hartts (TR 363).

This Court heard testimony from twelve-year-old Kevin Khamou (TR 68), who relayed an incident unknown to Files at the time the trap was set. Kevin's aunt, Maha, lives next door to Files (TR 18), and Kevin would often visit his aunt and cousins and play in the cul de sac (TR 68–69). During one such visit and while playing tag, Kevin had a run-in with a dog he claims was Zoey (TR 69, 73). The dog attempted to bite Kevin (TR 70). Scared that he might have been "poisoned," Kevin ran to another neighbor's house, Pattie Campos. Pattie was familiar with the dog because she had seen it "several times a week" for months, either perched on the Campos fence or in the Campos backyard, "tussl[ing]" with the Campos dogs or "strolling" in the area (TR 78–80). The dog was likely Zoey, although she did not know the dog's name (TR 81), and she never reported the dog.

The above evidence, considered in full, establishes that Zoey was not a vicious animal prone to attack. The only known bites or "nips" were to Drew or Files, neither requiring medical attention. Zoey displayed what could be described as aggressive, possibly playful conduct, toward non-family

members on infrequent occasions, and often roamed the neighborhood unattended over the years, but no complaints were made to the Hartts by Files or by any other neighbor.

**Animal Control is Called**

Matters escalated in early November 2012 when Files' wife, Judi, called Animal Control at his direction (TR 145). This first Animal Control visit did not resolve the issue of Zoey running loose (TR 145–47). When, later that month, the skateboard incident occurred, Drew called both his father at work and Animal Control, informing them of the "near-attack" (TR 24). An Animal Control officer, different from the officer who had previously responded (TR 144), arrived at the cul de sac and left a note at the Hartt residence (TR 25, 168–69). Neither Animal Control nor the Files family followed up with the Hartts.

Almost one month passed with no further incidents before Files approached David Bergman, WS Arizona State Director, and Chris Carrillo, WS District Supervisor. Bergman is Carrillo's immediate boss, and Carrillo, in turn, is Files' immediate boss (TR 95). Files attributes this delay to a desire to give Animal Control a chance to follow up on his November complaints (TR 104), yet he himself made no attempt to contact Animal Control or the Hartts. Aggravated by his neighbor's roaming pet dog, this Court concludes Files had made up his mind to reign in Zoey.

**Files Seeks Approval From His Bosses at Wildlife to Trap Zoey**

On December 14, 2012, Files requested permission from Bergman to set a trap on his own property (Doc. 54 at 14; TR 214, 267–68). Witness testimony clashes as to just what Files described as the target of his request. Bergman testified that while Files mentioned he was having issues with a neighbor's dog, he requested authorization to trap "feral free-roaming dogs in the neighborhood" (TR 214). "The majority of the focus was on multiple dogs in the neighborhood" (TR 241, 257).

Bergman's March 2013 sworn statement is consistent with this version of events (Ex. 113 at 4). Carrillo's March 2013 sworn statement (Ex. 114) is not in line with his testimony in federal court before Judge Campbell (Doc. 54 at 12–40). (Carrillo did not testify at trial, apparently hindered by possible perjury charges (TR 78)). Carrillo's sworn statement largely tracks Bergman's as it relates to the manner in which Files described the focus of his trapping request -- multiple free-roaming dogs including, but not limited to, the neighbor's dog (Doc. 54 at 14–15).

Bergman, Carrillo, and Files discussed how Files would lay the trap. "We discussed the [cage traps and padded leghold traps]. Both are viable options to catch dogs. We do use both styles of traps, and we discussed that option. [Files] asked whether a foothold trap could be used. I said that is an option that could be used. I said my preference would be for a cage trap" (TR 215). Bergman also requested that Files continue to "work with" Animal Control, but Files did not. Files claims he interpreted Bergman's direction to mean "if and when I catch Zoey, to turn the animal over to" Animal Control (TR 352–53). This interpretation is simply not credible. Further, Bergman asked Files to place the trap in a "secured location . . . [o]ne where [WS] would have control over, such as a fenced in backyard" (TR 215–16). Files did not follow this request either, and at the time offered no reason for not doing so. Finally, Files failed to post signage in violation of department policy (TR 30).

Bergman also required Files to fill out all necessary paperwork before setting the trap. That paperwork began, as it does in all such jobs, with a Cooperative Service Agreement ("CSA") (Ex. 103). Files does not explain why the relevant agreement in this case is dated December 10, 2012, several days *before* Files received the green-light from Bergman. Further, the CSA is signed by his wife Judi (who did not testify). She agreed to pay the USDA up to $500 for "feral dog removal" (TR

49). *See also* Ex. 104 (USDA invoice dated 2/28/13 for $69.99). This paperwork is a not-so-successful attempt at masking the self-dealing that was taking place.

On December 12, Files also completed a Work Initiation Document ("WID") (Ex. 102). The WID recites two pertinent pieces of information. First, in a box labeled "species information," Files recorded "coyotes, feral dogs, feral cats, skunks." The State claims these notations list the species Files had represented to his bosses that could be trapped. If true, this confirms the State's view that Files was less than forthcoming to his superiors about the true trapping target. Steven Fairzail, a former WS Arizona state director, claims the WID field would only be used to identify "target" species (TR 130) (i.e., species for which the trapping exercise was specifically undertaken) or "other species there you might *expect* to catch," *not* "hypothetical animals that could be caught in the trap" (TR 339–40) (emphasis added). Files explains he noted animals that *might* be caught in the trap (TR 101). However, no testimony supports the notion that coyotes or skunks were prevalent in the area near Files' house so that there would be a propensity to catch such animals.

**Files Traps Zoey**

Files set two traps on December 15, 2012 (TR 103). He placed both traps in his own front yard, where the backyard fence meets the wall of the house's attached garage near a trash bin (Doc. 50-7 at 1–2; Ex. 111C). He defied Bergman's instruction to set the trap in the backyard, allegedly because he did not want to trap either of his own pets (TR 352), who daily used the backyard (TR 137). Files "believes" he raised this issue with Bergman (TR 364), but neither Bergman nor Carrillo described such a discussion. Indeed, if Files had, then further discussion would have surely followed with Bergman or Carrillo about why the backyard was not used and where the traps should be set. Traps in the front yard were certainly a potential for catching other neighborhood pets or attracting children playing outside (TR 205).

Files opted to use WS's padded leghold traps, branded "Coyote Jake" (TR 104). Files anchored the trap to the ground using large rebar spikes, a standard trapping practice so that, once caught, the animal would not injure itself while roaming with the trap attached to its leg (TR 113–14). Files planted the trap beside an elk skull that was part of the yard decor for several years. Unlike other decorative animal skulls found elsewhere in his front-yard (Exs. 111D–F), the elk skull had a portion of its fur attached (Doc. 50-7 at 1).

On December 18, 2012, and while Files was at work, Zoey became caught in the trap. The nearest time estimate for when Zoey triggered the trap, supported by record evidence, are phone logs indicating Judi called Files on his government-issued cell phone at 1:58 p.m. to inform him Zoey had been trapped (Ex. 115 at 2). When Files took the call, he was with Carrillo in the WS warehouse. Files immediately left work to travel home (Doc. 54 at 18; TR 110). At 2:05 p.m., Files called Animal Control, but was unable to speak with its staff, receiving instead a general recording of the office hours (TR 110; Ex. 115 at 2).

At roughly 2:13 p.m., neighbor Steven Anspach noticed Zoey caught in the trap and phoned 911. Near the end of the roughly four-minute call (Ex. 116 at 3:10), Drew arrived home from work (TR 36–37). Anspach and Drew became engaged in a heated argument, audible on the 911 call tape. Drew refused to go near the dog, which he believed to be aggressive, and ordered Anspach off their property (TR 38). Files returned home soon after El Mirage police arrived at the scene. Detective Kimberly Walden first confronted Files who told her that he set the trap because Zoey had defecated in his yard (Doc. 54 at 41). His explanation to the contrary (TR 113) is simply not credible.

Animal Control officers arrived at around 3:00 p.m. (Doc. 54 at 52; TR 113), and Files assisted them in removing Zoey from the trap. Zoey was taken to a nearby veterinary hospital, where it became clear that Zoey had attempted to gnaw through one or both of the leg hold traps. In the

process, she damaged seventeen of her teeth so severely that the teeth had to be removed (or were lost outright). Zoey sustained injuries to her jaw as well. Crime scene photos show Zoey lost a significant amount of blood (Doc. 50-7), which one witness described as dripping from Zoey's mouth (TR 298).

In early January 2013, immediately upon release from a three-day stint in jail following arrest on the underlying charge of animal cruelty (TR 146), Files drafted, at Bergman and Carrillo's direction, a memorandum relating his version of events (TR 147). Files offered into evidence various drafts of that memorandum, and of a related letter, signed by Carrillo and seeking legal representation for Files (*see* Exs. 120–25). Writing in the first-person, Files described events preceding and following the trapping incident. At this point in time, Files was requesting WS to provide him with legal counsel; he and his supervisors were facing a USDA inquiry; and all three were scrambling to defend not only the criminal charge, but the negative publicity surrounding the wounded dog. These documents are inconsistent with sworn testimony, "gilding the lilly" on how dangerous Zoey was, and creating the false impression there were no alternatives other than "WS to use either non-lethal or lethal methods" (Ex. 125).

## DISCUSSION

### The Trapping Fell Within the Scope of Authority of an Urban Specialist

As explained above, Supremacy Clause immunity case law gives "grants of federal authority a generous sway" in determining whether an officer asserting the defense acted within the scope of his or her authority. *Livingston*, 443 F.3d at 1219. In *in re Neagle,* Deputy U.S. Marshal Neagle faced a state-court prosecution for killing a man who Neagle believed to be a mortal threat to U.S. Supreme Court Justice Stephen Field. The Attorney General assigned Neagle to travel with, and provide protection for, Justice Field during his time riding circuit, after an earlier run-in with the man Neagle eventually killed. The Court recognized that no "special act of Congress exists which

authorizes the marshals or deputy marshals of the United States in express terms to accompany the judges of the Supreme Court through their circuits, and act as a body-guard to them, to defend them against malicious assaults against their persons." *In re Neagle*, 135 U.S. at 58. Still, Neagle's conduct fell within the scope of the defense. "In the view we take of the Constitution of the United States, any obligation fairly and properly inferrible (sic) from that instrument, or any duty of the marshal to be derived from the general scope of his duties under the laws of the United States, is 'a law' within the meaning of [the Supremacy Clause]." *Id.* at 59. Several bodies of authority place the trapping of a domesticated animal within an urban specialist's authority.

First, we start with the Secretary of Agriculture's general authority to "conduct a program of wildlife services with respect to injurious animal species and take any action the Secretary considers necessary in conducting the program." 7 U.S.C. § 426. Federal statute further empowers the Secretary to make expenditures, hire staff, and "employ such means as may be necessary to execute the functions imposed upon him by this Act." *Id.* § 426(b). Finally, the Secretary is permitted to "conduct activities and to enter into agreements with . . . individuals . . . in the control of nuisance mammals and birds," *id.* § 426(c), the apparent source of authority for the CSA used in this case.

Second, WS traps domesticated animals, albeit rarely, a fact supported by the testimony of every witness -- whether sponsored by the State or Files -- with personal knowledge of WS activities. Files himself had previously trapped free-roaming dogs during an assignment at a military installation (TR 135) -- a distinguishable scenario. Bergman testified WS had "caught domestic dogs before at the request of other agencies and of the public whose dogs got away and they have come to us and asked us to catch dogs for them because they were unable to get their dog back" (TR 224), and that WS in other states operate under contracts "where most of the work we do is to catch dogs" (TR 225).

Files violated generally-applicable WS policies in the course of setting this trap, including avoiding an "appearance of [a] conflict of interest" in violation of WS Directive 4.120 (Doc. 50-5). Further, Files had an actual conflict of interest -- about this there is and can be no dispute. He was not acting at the request of some third party or neighbor -- he himself initiated this trapping scenario, generated documentation before seeking approval from his employers, and then targeted a neighbor's dog which, while perhaps a pest because often loose, was not a threat to human health and safety and belonged to a neighbor with whom Files had an acrimonious relationship. Files also departed from Bergman's instructions by setting the trap in an unsecured location, without notice to any of his neighbors or signage of any kind, and he used a padded leghold trap, not Bergman's preferred cage trap. Still, for purposes of the "scope of authority" inquiry, the evidence shows an urban specialist is generally authorized to trap domesticated animals under certain circumstances. How the urban specialist goes about exercising that authority -- for example, whether he violates federal agency procedure -- is relevant in determining whether his or her conduct was "necessary and proper." This Court turns next to that inquiry.

**Files did not Honestly or Reasonably Believe his Conduct was Necessary to Perform his Duties**

Though trapping a free-roaming dog is a task that might fall within the scope of a WS urban specialist's authority in the ordinary course, Files must further demonstrate "he had an honest and reasonable belief that what he did was necessary in the performance of his duty." *Morgan*, 743 F.2d at 731. Again, the case law's focus on an "honest and reasonable belief" establishes subjective and objective components to the analysis. "On the subjective side, the agent must have an honest belief that his action was justified. On the objective side, his belief must be reasonable." *Kentucky v. Long*, 837 F.2d 727, 745 (6th Cir. 1988). This Court must assess Files' actions under the circumstances as

they existed at the time of the trapping incident. *See Clifton*, 549 F.2d at 728. Thus, this Court determines, first, whether Files honestly believed the manner in which he set out to trap Zoey was reasonable and whether that honest belief was objectively reasonable. Files fails on both counts.

In determining whether Files honestly believed his actions were justified, this Court looks to what he told his supervisors and how he executed the trapping. Files did not disclose all the key facts, and he misrepresented the need for this exercise, which must be viewed in the context of a personal dispute he had with his neighbor (Doc. 81 at 33). The November 2012 incidents were relatively minor, and Files exaggerated their seriousness. And of course, Files failed to credibly explain his disregard of several specific requirements of the trapping exercise. Files had never before used his position to catch a dog in the neighborhood, much less a dog on his own property (Doc. 81 at 27). Nor was this a dog that threatened human health or safety (Do. 81 at 29) -- just because Files says Zoey was a threat does not does not make it so. Moreover, this exercise was not requested by *any* neighbor. This Court concludes his approach to his supervisors was not taken in good faith. Nor were his actions "objectively reasonable." Here, the testimony of former WS director, explaining the various ways in which Files acted inappropriately, is especially credible and grounded in common sense.

The admitted dislike between the Fileses and Hartts underlies this entire unfortunate incident. The bitterness of this neighborhood feud was evident at trial (TR 92, 167, 181, 191). Moreover, this trapping was not, as Files represented to his second-line supervisor, a request by neighbors (Ex. 113 at 2). It was personal. This Court is convinced that Files set out to trap Zoey not because he felt it was part of his job to do so, but because he sought to use the tools of his job and the authority of an urban specialist to satisfy a personal problem.

## CONCLUSION

Files did not truthfully and fully explain to his supervisors the nature and purpose of his trapping exercise. His failure to do so undermines his entire claimed authority to act as he did. His was a deliberate and planned exercise, not a split-second judgment call. Without an honest disclosure to his supervisors, he cannot cloak himself with immunity under the Supremacy Clause, which is appropriately applied to prevent states from prosecuting a federal officer who, in good faith and in a reasonable manner, carries out his or her federal duties. The defense does not protect a federal officer who misuses his or her position to further wholly personal interests.

At trial, Files will have the opportunity to prove his legal or factual innocence on grounds unrelated to this Motion. The denial of this Motion in no way suggests how that trial might unfold. Instead, this ruling applies a century-old test, according to binding legal standards, and concludes Files is not protected from further legal proceedings.

IT IS SO ORDERED.

s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

July 31, 2014